UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

_____

UNITED STATE OF AMERICA,

        Plaintiff,                              Case No. 97-CR-80235

vs.                                                  HON: ARTHUR J. TARNOW

JOHN BASS,

        Defendant.

_____

## SUPPLEMENTAL MOTION IN SUPPORT OF COMPASSIONATE RELEASE

NOW COMES John Bass by counsel Douglas R. Mullkoff who supplements Defendant's pro se pleading as follows:

### Introduction.

On August 11, 2003, Defendant was found guilty of violations of Title 21 USC §§ 846 Conspiracy to Distribute Cocaine Base; 848 Intentionally Killing; 18 USC §§ 2 Aiding and Abetting and 924(j) Firearm Murder During or Relation to Drug Trafficking Cocaine (Case No: 97-CR-80235).

On March 11, 2004, he was sentenced to life in prison. Mr. Bass has serious health problems. First, he meets the definition for being morbidly obese. Second, he suffers from hypertension which results in high blood pressure. Third, his elevated blood sugar levels place him squarely in the category defined as pre-diabetic.

1

Obesity and morbid obesity are terms of art used in the medical profession. A calculation of a person's body mass index (BMI) is used to come up with a score, using two factors, physical height and physical weight. Mr. Bass is 6'2 inches tall, according to his presentence report (See Exhibit 1, page 17 of PSR). According to a Bureau of Prisons Health Service record dated July 31, 2020, his current weight is 322 pounds. (See Exhibit 2, page 2). According to a Bureau of Prisons medical document dated July 31, 2020 his BMI is 40 (Exhibit 3, page 1). According to the Center for Disease Control (CDC) BMI calculator his BMI is 41.3 (Exhibit 4). Whether the correct BMI for Mr. Bass is 41.3 or 40, either way he fits the definition for morbid or severe obesity. According to the National Institute of Health, (NIH) morbid obesity is defined as having a BMI of 40 or having a BMI of 35 or greater and one or more co-morbid conditions (Exhibit 5).

Mr. Bass is currently treated for hypertension which is a co-morbidity. His medical record acknowledges his morbid obesity hypertension and high cholesterol (hyperlipidemia) (See Exhibit 6). A June 16, 2020 medical record concerning diabetes shows Mr. Bass' hemoglobin A1C level to be 5.8. Individuals with levels between 5.7 and 6.4 are deemed to be at "increased risk" for developing Diabetes, also referred to as pre-diabetes. (See Exhibit 7).

Studies have shown that of those hospitalized for severe coronavirus disease, 22.2% to 26.9% reported living with diabetes," and "[d]iabetes and high

glucose levels are associated with increased complications, respiratory failure and mortality in hospitalized patients with COVID-19."[1] The CDC recently reported that, of those COVID-19 patients hospitalized who had underlying conditions, 50 percent had hypertension.[2] The risk to Mr. Bass' life and health are serious.

A strong relationship has been identified between morbid obesity and COVID-19 given the impact of obesity on pulmonary function. See Science Daily article "Relationship between COVID-19 deaths and morbid obesity (Exhibit 8), and "Obesity and Its Implications for COVID-19 Mortality, Exhibit 9).

I. **ARGUMENT**

Individuals suffering from morbid obesity, diabetes, and hypertension are among those who may be at high-risk for severe illness from COIVD-19[3]. [4]The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

---

[1] American Association of Clinical Endocrinologists, *AACE Position Statement: Coronavirus (COVID-19) and People with Diabetes (Updated March 18, 2020),* https://bit.ly/2Y0vZV0

[2] Shikha Garg et al, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 020*, CDC (Apr. 8, 2020), https://bit.ly/2TYdVJR.

[3] *See* CDC, *Groups at Higher Risk for Severe Illness*, CDC https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[4] WHO, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

>    (1) in any case--
>
>    (A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553 (a) to the extent that they are applicable, if it finds that**--
>
>    (i) **extraordinary and compelling reasons warrant such a reduction**; . . .
>
>    *****
>
>    **and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

18 U.S.C. § 3582 (c) (1) (A).

Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction; (2) consider the relevant sentencing factors under 18 U.S.C. § 3553 (a); and (3) ensure any reduction is consistent with applicable policy statements.

### A. The Court has Authority to Grant Relief. Mr. Bass Presented a Request for Compassionate Release to the Warden; and the Warden has Denied his Request.

Mr. Bass asserts that he submitted a request for early release on June 9, 2020 to the Warden of FCI McKean (Exhibit 10). The request was denied. (Exhibit 11).  18 U.S.C. § 3582 (c) (1) (A) permits courts to consider

compassionate-release motions brought by incarcerated defendants if one of two requirements is met. First, courts can consider such motions "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." *Id*. Second, courts can consider such motions after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.* The earlier of these two dates controls. According to Exhibit 11, the warden denied his request on June 12, 2020; thus the statute has been satisfied, and this Court may review the instant motion.

In this Court's September 14, 2020 Order, Defendant was instructed to "provide the Court with evidence that he has requested compassionate release under § 3582, rather than home confinement under 18 USC § 3624 (c) (2). In his letter to the Warden Mr. Bass does not cite to any specific statute, but checked a box on the form reading "Request based on new law. Section 2 of the form request he turned in asks him to explain why he should be given compassionate release. (See Exhibit 10). The Warden, in his letter denying the request was treating it as a request under §3582 (c) 1 (A). No mention was made regarding § 3624 (c) (2) or any reference to home confinement. Mr. Bass properly complied with the exhaustion requirements.

      **B.**    **Mr. Bass's Vulnerability to COVID-19 is an Extraordinary and Compelling Reason for an Immediate Sentence Reduction**

### to Time Served

### 1. Extraordinary and Compelling Reasons

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," Black's Law Dictionary (10th ed. 2014). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.* The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetime. The grave risk to Mr. Bass based on his significant health issues from continued incarceration provides an extraordinary and compelling reason for his immediate release.

U.S.S.G. § 1B1.13, application Note 1, states, in part, extraordinary and compelling reasons exist when the defendant is suffering from a serious physical or medical condition. Mr. Bass is 51 years old, is suffering from morbid obesity, pre-diabetes and hypertension, all of which are serious medical conditions. These conditions place him at a higher risk to both contract COVID-19, and an increased likelihood that severe illness or death will occur if he contracts COVID-19 while incarcerated. Because of this, he meets the standard for extraordinary and compelling reasons for release pursuant to 18 U.S.C. § 3582

(c) (1) (A) and U.S.S.G. § 1B1.13 cmt. n. 1. Morbid obesity and hypertension are co-morbidities for COVID-19.

Assuming arguendo, the Court does not find extraordinary and compelling reasons exist as defined in the Sentencing Guidelines, the Court has the authority to find extraordinary and compelling reasons other than as expressly identified in commentary to U.S.S.G. § 1B1.13. In 28 U.S.C. § 994(t). Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, has not been amended since November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, a growing number of district courts have concluded the Commission lacks a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c) (1) (A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

7

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13 commentary.

The COVID-19 pandemic is an unprecedented rapidly-expanding global health emergency that presents a serious medical risk to vulnerable prisoners, allowing the Court to find "extraordinary and compelling reasons" exist for release.

### C. Consideration of Relevant 3553(a) Factors.

(1) Nature and Circumstances of offense and characteristics of Defendant. This cocaine conspiracy indictment spanned from 1989-1997, starting when Mr. Bass was 20 years old. There were two murders in connection with drug trafficking crime charges. Mr. Bass was convicted of one and acquitted of the other.

Mr. Bass' Mother Carolyn Webb brought him from California to Detroit when he was 4 years old. He has never had contact with his father since he was 4 years old. His mother had a long history of substance abuse. He and his siblings lacked essentials such as clothing and food during their formative years. Because

8

of her addiction, John and his siblings were often forced to fend for themselves at a very young age. Money which should have been used to nurture the children was spent instead on drugs. At age 8 his mother's boyfriend was shot and killed while John Bass was in the house. His mother had killed the man in the family home apparently because she had endured all the abuse she could take from the man. Needless to say this was a traumatizing event for an 8 year old to experience in his home. No doubt, it scarred him for life. Of his eight half siblings, none of them graduated from high school. According to the presentence report (PSR), half sibling Randolyn Perry said that John Bass was essentially the father figure to his younger siblings. According to Randolyn, the children were often unable to attend school due to lack of clothing.

During the last four years before being locked up, Mr. Bass was addicted to heroin and using it on a daily basis. His last grade completed was eighth grade. According to the PSR, Mr. Bass has 6 children and he appears to have had a good relationship with them.

Mr. Bass' institutional record has been free from conduct that would give the Court reason to have concerns. After being locked up for almost 22 years, Mr. Bass has only received 8 disciplinary citations. Three involved "phone abuse" or unauthorized use of the phone. One was for insolence. Two were for "accepting money without authorization" and one was for "possession of an

unauthorized item". The only misconduct approaching assaultive behavior was his 2017 misconduct for "fighting". A closer look at the incident, however, points a picture of John Bass being subjected to an unprovoked attack in the cafeteria by an inmate armed with a sharp weapon. Mr. Bass suffered a 4 cm laceration to the left side of his cheek, a 6 cm laceration to his left lower cheek, a 14 cm laceration from his left cheek to his left scalp and other lacerations to his upper lip and lower lip. It took 31 stitches and 17 staples to close these serious wounds. (See medical record, Exhibit 12, page 4). The disciplinary hearing officer after reviewing video tape from the cafeteria concluded that "you did not start the fight". He went on to write "however, you were viewed exchanging punches with the other inmate so you are technically guilty of fighting". It is hard to imagine anyone not trying to defend himself while being slashed across the face multiple times with a sharp weapon! (See Exhibit 13, Disciplinary report at 2-3). The sanction of 30 days disciplinary segregation was suspended by the hearing officer after considering the mitigating circumstances. The hospital bed photo of Mr. Bass' bloody face is hard to look at. (See Exhibit 14, photo after Mr. Bass was assaulted).

      In summary, nothing in the disciplinary record over the past 21+ years should give the Court pause when considering Defendant's request for compassionate release.

John Bass earned his GED while in the Bureau of Prisons. Additionally, he has invested over 1,000 hours in course work aimed at self-betterment. He completed a 360 hour computer applications training and a 230 hour building trades course. He completed a 40 hour facilitator training and a 40 hour course from the Institute for Life Coaching. Other studies involved wellness classes, leather working, air conditioning, income tax, real estate, creative writing, history and a study concerning domestic violence. (See Programing History, Exhibit 15).

As stated earlier, he suffers from high blood pressure resulting from hypertension, he is pre-diabetic and he is morbidly obese.

(2) Resentencing Mr. Bass to time served and supervised release would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment. It would be sufficient to deter Defendant and others from similar wrongdoing and protect the public. The length of incarceration served to date has already provided Mr. Bass with needed educational, vocational and medical care.

## **CONCLUSION**

After taking into account the 3553 (a) factors and the medical conditions Mr. Bass suffers from which make him highly vulnerable to COVID-19 death, this Court should exercise its authority and resentence Mr. Bass to time served

and supervised release.

Dated: 10/2/2020                    Respectfully submitted,

/s/ Douglas R. Mullkoff
Douglas R. Mullkoff
Attorney for Defendant
402 West Liberty
Ann Arbor, Michigan 48103
(734) 761-8585
doug@kmhlaw.com
(P33252)

## **CERTIFICATE OF SERVICE**

STATE OF MICHIGAN        )
                         ) ss:
COUNTY OF WASHTENAW  )

I hereby certify that on the 2nd day of October 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Timothy Wyse at the U.S. Attorneys Office.

Dated: 10/2/2020

Respectfully submitted,

/S/ Douglas R. Mullkoff
Attorney for Defendant
402 West Liberty
Ann Arbor, Michigan 48103
(734)761-8585
doug@kmhlaw.com
(P33252)