UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Criminal Case No. 97-80235-1

v.

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

JOHN BASS,

Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. 3582(C)(1)(A)(I) [1117]**

On August 11, 2003, a jury convicted John Bass of Conspiracy to Distribute Five Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base, in violation of 21 U.S.C. §846, and Firearms Murder During or in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. §924(j). Upon conviction, the Government sought, and the jury denied, a sentence of death. (ECF No. 1007). On March 11, 2004, the Court sentenced Mr. Bass to two concurrent terms of life in prison, without the possibility of release. (ECF No. 1047).

On June 29, 2020, John Bass filed a Motion to Reduce Sentence Pursuant to 18 U.S.C. 3582(c)(1)(A)(i) [1117] due to the COVID-19 pandemic. The Court appointed counsel on September 14, 2020. (ECF No. 1119). Bass filed a Supplemental Brief [1120] on October 2, 2020. The Government filed a Response

[1122] on October 5, 2020. Bass filed a Reply [1124] on October 7, 2020. On October 13, 2020, the Court held a hearing on the Motion [1117] and ordered the parties to provide supplement briefs. (ECF No. 1127). Bass and the Government filed Supplemental briefs [1129] [1130] on December 10 and 11 of 2020, respectively. For the reasons stated below, the Court **GRANTS** Bass's Motion to Reduce Sentence [1117].

## FACTUAL BACKGROUND

### a. Personal Information

Mr. Bass was born in Oxnard, California and moved to Detroit with his mother and siblings at the age of four. (PSR ¶ 72). He has not had any contact with his father since he moved to Michigan. (*Id.*). Bass has eight half-siblings; two are older, six are younger. (*Id.* ¶ 74). Growing up, Bass's mother struggled with substance abuse and often bought drugs instead of basic necessities like food and clothing. (*Id.* ¶ 72). This led Bass and his siblings to drop out of school early. (*Id.* ¶ 74). Bass's sister, Randolyn Perry, reports that Bass "was essentially the father figure to his younger siblings" and financially supported the family. (*Id.*). In addition to caring for themselves, Bass and his siblings experienced significant trauma from a young age. (*Id.* ¶ 72). At eight years old, Bass witnessed his mother shoot and kill her partner who had abused her for years. (*Id.*).

In 1992, Bass married Jenine Dortch and had three children, all of whom reside with Dortch in Atlanta. (*Id.* ¶ 75). He and Dortch divorced in 2000. (*Id.*). Bass also had three additional children with two other women; each child resides with their mother in Detroit. (*Id.*).

Bass has abused heroin, cocaine, PCP, and marijuana throughout his life, however, it has now been several decades since he last used illegal substances. (*Id.* ¶ 79). Bass has no significant employment history apart from flipping houses from 1993-1997. (*Id.* ¶¶ 81-82). Prior to this offense, Bass had five convictions for arson, theft, and breaking and entering. (*Id.* ¶¶ 51-60). His longest prison term was for five months for receiving stolen property in 1998. (*Id.* ¶¶ 59-60).

### a.  Offense Conduct

From 1989 to 1997, Bass formed and lead a drug trafficking organization known as the "Dog Pound." (*Id.* ¶¶ 13-14). The exact amount of drugs distributed is unknown, but the Government claims the organization distributed in excess of fifty kilograms of crack cocaine and five kilograms of cocaine in Detroit, Pontiac, and Canton, Ohio. (*Id.*). Bass controlled the organization along with several of his half-brothers, including Patrick and Cornelius Webb, and maintained several drug houses. (*Id.* ¶ 14).

On August 11, 2003, a jury acquitted Bass of one count of Firearms Murder During or in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. §924(j)

and convicted him of a separate count of Firearms Murder During or in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. §924(j) and Conspiracy to Distribute Five Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base, in violation of 21 U.S.C. §846. (ECF No. 1047). On March 11, 2004, the Court sentenced Bass to two concurrent terms of life in prison, without the possibility of release. (*Id.*). He was thirty-four years old. All of Bass's twenty-one co-defendants either had their charges dismissed or have since been released from prison. *See infra* pp. 24-25.

     b)  <u>Medical Condition and Prison Record</u>

Mr. Bass is now 51 years old and is in custody at Federal Correctional Institute (FCI) McKean. His medical records indicate that at 6'2" and 322 pounds, his body mass index (BMI) is over 40. (ECF No. 1120-4, PageID.815-16). Bass additionally suffers from hypertension and pre-diabetes. (ECF No. 1120-3; ECF No. 1120-7).

In prison, Bass has obtained his General Educational Development (GED) degree and participated in a long list of classes and programs including: drug education, re-entry, computer applications, building trades, and air conditioning. (ECF No. 1129-8, PageID.1123); (ECF No. 1129-9, PageID.1130); *see infra* pp. 13-14. He has become a certified life coach, facilitates re-entry classes, and works as a custodian. (ECF No. 1129-8, PageID.1114, 1117, 1123); (ECF No. 1129-7,

PageID.1098). He has also re-committed to religion and regularly attends religious services and classes. (ECF No. 1117, PageID.788).

In his twenty-two years of incarceration, Bass has received four disciplinary citations for phone abuse, accepting money without authorization, possession of an unauthorized item, and fighting, the last of which occurred in 2017. (ECF No. 1124-1). Bass argues, however, that the 2017 fight was one of six different occasions where he was attacked for assisting the Government in a homicide investigation. The attack permanently damaged the left side of his face. (ECF No. 1120-15, PageID. 837).

Bass submitted a written request to the warden of FCI McKean on June 9, 2020, asking for compassionate release. (ECF No. 1120-11). The warden denied the request on June 12, 2020. (ECF No. 1120-12).

## ANALYSIS

The compassionate release statute states the following in relevant part.

> **(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> **(i)**    extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1).

## I.    Exhaustion of Administrative Remedies

Before a prisoner can move for compassionate release under 18 U.S.C. § 3582(c)(1)(A), "[t]hey must 'fully exhaust[ ] all administrative rights' or . . . wait for 30 days after the warden's 'receipt of [their] request.'" *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020). Bass made a compassionate release request on June 9, 2020 and was denied on June 12, 2020. (ECF No. 1120-11); (ECF No. 1120-12). There is therefore no dispute that he has exhausted his administrative remedies.

## II.    Extraordinary and Compelling Reasons for Release

Under *United States v. Jones*, because Bass has properly exhausted his administrative remedies, the Court must proceed through the following three-step inquiry:

> At step one, a court must "find[]" whether "extraordinary and compelling reasons warrant" a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). At step two, a court must "find[]" whether "such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A) (emphasis added). . . . At step three, "§ 3582(c)[(1)(A)]" instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." [*Dillon v. United States*, 560 U.S. 817, 827 (2010).]

*United States v. Jones*, No. 20-3701, 980 F.3d 1098, 1107-08 (6th Cir. 2020) (first

four alterations in original) (footnotes omitted). And where, as here, there is no "applicable" policy statement, "district courts have discretion to define 'extraordinary and compelling' on their own initiative." *United States v. Elias*, No. 20-3654, 2021 U.S. App. LEXIS 251, at *6 (6th Cir. Jan. 6, 2021) ("in the absence of an applicable policy statement for inmate-filed compassionate-release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative.") (citing *Jones*, 980 F.3d at 1111; *United States v. Ruffin*, 978 F.3d 1000, 1007 (2020)). Here, the Court finds the risk posed to Bass from his medical conditions and the spread of COVID-19 at FCI McKean constitutes extraordinary and compelling reasons for compassionate release.

The Government concedes that Bass is suffering from a serious medical condition. Bass has a BMI over 40. (ECF No. 1120-4, PageID.815). The Center for Disease Control and Prevention has recognized that people with severe obesity, defined as having a BMI of 40 and over, have an increased risk of severe illness from COVID-19. *People with certain Medical Conditions,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity [https://perma.cc/74XX-5HS9] (last visited January 21, 2021).

Furthermore, the Court has serious concern for Bass's health and safety in FCI McKean. The prison currently has the second highest number of inmates with

COVID-19: 147. *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ [https://perma.cc/F3HG-X8ZP] (last visited January 21, 2021). Additionally, 236 inmates have already contracted and recovered from the virus, meaning approximately 46% of its population is or has been infected. *Id.*; *FCI McKean*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/mck/ [https://perma.cc/R2KX-DD6R] (last visited January 21, 2021). Despite this increased risk of infection, not all prison populations are being prioritized for inoculation. Michael Balsamo, *Reversing Course, Feds Say Some US Inmates Get Virus Vaccine*, AP NEWS (Dec. 22, 2020), https://apnews.com/article/coronavirus-pandemic-prisons-d2c1a3013351ed42cf75a194e4661cf3 ("The Federal Bureau of Prisons says it has started to give the coronavirus vaccine to *some* high-risk inmates but won't say how many inmates have been vaccinated or how it selects those to receive the vaccine." (emphasis added)). Continuing to incarcerate Bass under such conditions while the virus runs rampant is a potentially deadly decision with no end in sight. *See* Beth Schwartzapfel et. al, *1 in 5 Prisoners in the US Has Had COVID-19, 1,700 Have Died*, AP NEWS (Dec. 18, 2020), https://apnews.com/article/pandemics-race-and-ethnicity-prisons-united-states-coronavirus-pandemic-0bef0673013aa579551db5ad61b885e0 (reporting that although one in every five state and federal prisoners have tested positive for the coronavirus, "[t]hat number

is a vast undercount," and that many infected prisoners become sicker than they need to be due to inadequate care); *see also* Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. Times (March 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html [https://perma.cc/936P-VH6H] (citing densely populated living conditions, shortage of masks, soap, and hand sanitizer, and the inability to routinely disinfect surfaces and maintain safe distances between inmates and guards as reasons prisoners are at increased risk of infection); Courtney Bublé, *Federal Prisons Pose 'Imminent Danger' in Spreading COVID-19, Union Says*, GOV'T EXEC. (April 6, 2020), https://www.govexec.com/oversight/2020/04/federal-prisons-pose-imminent-danger-spreading-covid-19-union-says/164390/ [https://perma.cc/9W22-KX9Q] (detailing a prison workers' union complaint to OSHA complaining of "imminent danger" due to the BOP's failure to follow national safety guidelines). Accordingly, the Court finds that the risk to Bass's health is an extraordinary and compelling reason for his release.

## III.   Section 3553(a) Factors

At the last step, the Court must consider whether any applicable 18 U.S.C. § 3553(a) factors warrant a sentence reduction. "[T]he deferential abuse-of-discretion standard requires district courts to supply specific factual reasons for their compassionate release decisions." *Jones*, 980 F.3d at 1101-02. However, "'as long

as the record as a whole demonstrates that the pertinent factors were taken into account by the district court[,]' a district judge need not 'specifically articulat[e]' its analysis of every single § 3553(a) factor." *Id.* at 1114 (quoting *United States v. Curry*, 606 F.3d 323, 330 (6th Cir. 2010)). The § 3553(a) factors are as follows:

> **(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed--
> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> **(3)** the kinds of sentences available;
> **(4)** the kinds of sentence and the sentencing range established for--
> **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
> [. . .]
> **(5)** any pertinent policy statement—
> [. . .]
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553. The Government solely opposes Bass's release based on the potential danger he poses to the community. Although the Court recognizes both the merits of the Government's arguments and the severity of Bass's past crimes,

the Court holds that Bass's record of rehabilitation from twenty-two years of incarnation significantly mitigates his risk of recidivism. *See Pepper v. United States*, 562 U.S. 476, 491 (2011) (stating that "evidence of post sentencing rehabilitation" is "highly relevant" in evaluating the § 3553(a) factors).

There is no question that Bass's offenses were horrific. For years, the "Dog Pound" inflicted harm on its own members and members of the community alike. Yet, examining Bass's crimes through the lens of his personal history renders them sadly unsurprising. Bass was reared in abject poverty, largely without parental supervision and guidance. His age and natural leadership ability led him to raise both himself and his siblings through childhood — experiencing unaddressed household trauma along the way. *See* Nancy Wolff & Jing Shi. *Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment*, 9 INT'L J. ENVTL. RES. & PUB. HEALTH, 1908 (2012) (detailing how childhood trauma, abuse, and abandonment "increase the risk for violent and aggressive behavior and criminality in adulthood"). Bass's own mother even admits that his childhood was cut short. (ECF No. 1129-7, PageID.1104); *see also* (ECF No. 1129-7, PageID.1105 (letter from Bass's sister stating that they grew up with "no parental guidance, no food[,] . . . [no] clothes[,] . . . so no school sometimes, no electricity,

no gas, no water, and no father"). Preoccupied with his role in the family, Bass dropped out of school in the ninth grade.

Bass's history does not excuse his crimes. However, it offers essential context for the circumstances under which they were committed — an important factor in evaluating whether a sentence reduction is appropriate. *See Pepper*, 562 U.S. at 488 ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender") (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). Here, the Court finds that the nature of Bass's crimes balanced with the circumstances under which they were committed shows that Bass's twenty-two-year incarceration is "sufficient, but not greater than necessary," to fulfill the purposes of his punishment. 18 U.S.C. § 3553(a); *see also Pepper*, 562 U.S. at 487-88 ("[T]he punishment should fit the offender and not merely the crime") (quoting *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949)).

Therefore, considering that over two decades have passed since his crimes were committed, the Court evaluates Bass not as he was on the day of sentencing, but as he is today after spending years facing his past and overcoming the challenges of his upbringing. *See United States v. Bryson,* 229 F.3d 425, 426 (2d

Cir. 2000) (*per curiam*) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing [and resentencing]"); *see also United States v. Core,* 125 F.3d 74, 77 (2d Cir. 1997) (stating that the court, in resentencing, was "required to consider [the defendant] as he stood before the court at that time").

Bass has committed himself to taking full advantage of the rehabilitation and educational programs available to him through the BOP. He has spent over 1,000 hours in classes and training programs in life coaching, critical theory errors, re-entry, victim impact, forgiveness, GED, and drug abuse education. (ECF No. 1129-8, PageID.1114-23); (ECF No. 1129-9). Bass additionally spent over 18 months completing the Life Connections Program, which consists of classes geared toward building an inmate's character, as well as their interpersonal, cognitive, and vocational skills. (ECF No. 1129-9, PageID.1129).

In his own words, Bass states that early on in his sentence, he understood "that prison was just a smaller world of the same environment that [he] came from." (ECF No. 1129-6). With that in mind, he consciously avoided negative influences and focused his energy on changing and "learn[ing] who [he] really was." (*Id.*). Looking back at his life, Bass expresses deep remorse and shame over his lifestyle and claims prison gave him the opportunity to become "the person who [he] was meant to be." (*Id.*).

Most notably, Bass has spent a considerable amount of time becoming a life coach. Under the Institute For Life Coach Training's ("Institute") instruction, Bass completed the Hope Coaching Project. (ECF No. 1129-8, PageID.1115). The Institute aims to help students develop relationships with peers and clients to help them "bridge the gap between where they are now and where they want to be." *What Is Coaching?*, INST. FOR LIFE COACHING TRAINING https://www.lifecoachtraining.com/about/what_is_coaching [https://perma.cc/U4WL-MFWF] (last visited Dec. 31, 2020). After completing this course, and with the glowing recommendation of his instructors, Bass earned a full tuition scholarship to enroll in the Institute's Foundations course. (ECF No. 1129-7, PageID. 1111, 1113). This course is the Institute's cornerstone training program and is designed, through classes, assignments, and mentor coaching exercises, to launch a student's coaching career. *Foundations*, INSTITUTE FOR LIFE COACHING TRAINING, https://www.lifecoachtraining.com/programs/all_courses/foundations_course [https://perma.cc/U4WL-MFWF] (last visited Dec. 31, 2020). Bass's instructors' recommendation letter for the scholarship highlighted the following:

> Mr. Bass came to the Hope Coaching Project already a leader amongst his peers. His natural abilities of listening, understanding those he listens to, and making informed decisions has been enhanced due to his commitment at excelling inside, and outside the classroom. It is clear to all in the McKean Community that he will become an impressive Coach, Orator,

and Author once he is exposed to the in-depth teaching of the Foundations and Practicum courses.

We look forward to witnessing the continued growth of Mr. Bass' knowledge and skill-set. He has the full support of the entire coaching community behind him. His success is inevitable, and it is with great pride and joy, that we look forward to congratulating him on his future accomplishments and success.

(ECF No. 1129-7, PageID. 1111). Bass completed the program in June 2019. (ECF No. 1129-8, PageID. 1114). He plans to use his coaching skills to mentor youth in his family and community. (ECF No. 1129-6). In addition, Michigan Liberation, a local non-profit dedicated to community leadership development, has offered to further support Bass outside of prison by offering him reentry coaching services. (ECF No. 1129-7, PageID.1097); MICH. LIBERATION, https://miliberation.org/ [https://perma.cc/76Y2-PATW] (last visited Jan. 8, 2020).

Bass's transformation is not only evident to those who have worked with him in prison but also to those who knew Bass before prison and have witnessed his evolution. The Court has received letter after letter detailing Bass's remorse, ownership, and growth. Bass's wife, Katrina Bennett, writes that Bass "is very regretful and remorseful for his past criminal affinity." (ECF No. 1129-7, PageID.1107). Bass and his mother in law, Vivian Bennet, talk on the phone almost every day. (*Id.* at 1107). With each call, Bennett becomes more proud of his progress. (*Id.*).

Bass's 29-year-old, DaysJohn Yancy, has not seen his father since he was six years old. (*Id.* at 1102). Despite this, Bass has guided Yancy through some of the most difficult times of his life. In 2016, Bass helped Yancy navigate his own incarceration in federal prison, "teaching [him] to take programs such as RDAP," the residential drug abuse program. (*Id.*). Yancy states that without this advice he "probably would have been in prison longer." (*Id.*). After Yancy's release, Bass continued to encourage him to follow his dreams and reminded him to "stay on track so [he doesn't] end up going back down on the wrong path." (*Id.*). Yancy is now manager at a Dollar Store and is starting his own entertainment company. (*Id.*).

Tragically, Yancy also reports that his mother passed away from COVID-19 and left behind seven children. (*Id.*). In the wake of her death, Bass has supported Yancy as he takes care of his younger siblings — a role Bass knows all too well. Yancy knows that his "father is a changed man" and looks forward to benefiting from his wisdom and love upon his release. (*Id.*).

Bass's sister, Randolyn Perry, and his mother, Carolyn Webb, both corroborate Bass's desire to support his family and community upon his release. (*Id.* at 1104-05). Bass has shared with them that he is eager to be more active in his children's lives, help raise his grandchildren, and inspire others to be great. (*Id.*).

Lastly, Bass's niece, Jasmine Webb, has never known Bass outside of prison. (*Id.* at 1106). Yet, she describes that Bass has been a "very active figure in [her] life," imparting advice and wisdom through the years during visits and phone calls. (*Id.*). Bass's mother conclusively describes him best as "everyone's father." (*Id.*). It goes without saying that each family member expresses their desire for Bass to return and their eagerness to support him in his transition.

One indicator of Bass's recidivism risk is the BOP's PATTERN score. The Prisoner Assessment Tool Targeting Estimated Risk and Need (PATTERN) score measures a prisoner's recidivism rate based on factors indicating progress and regression. 18 U.S.C. § 3635 (6). Under this metric, the BOP concludes that Bass has a LOW recidivism risk, the second lowest rating on a four-point scale of minimum, low, medium, and high. (ECF No. 1129-2, PageID.1080).

Bass's rehabilitated character is also reflected by his short disciplinary history in prison — only receiving four disciplinary citations in twenty-two years is a notable feat. *See United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076, at \*13-14 (D. Haw. October 27, 2020) (finding that "in the face of a life sentence," defendant "maintained an impressive prison record with only three minor infractions during his twenty-three years of incarceration," which "strongly support[ed] the likelihood that he would remain a rule-abiding individual if released").

Most of Bass's citations have been for minor offenses (e.g. phone abuse), however, his most recent was for fighting. The BOP incident report explains that in the dining hall on November 27, 2017, Bass and another inmate struck "each other with closed fists to the head and upper torso." (ECF No. 1129-4, PageID.1085). Staff members then separated the inmates. (*Id.*). Bass was left with "multiple lacerations on [his] face" and the other inmate was found to have a "homemade weapon" on his person directly following the fight. (*Id.*); (ECF No. 1120-13, PageID.830); ECF No. 1129-4, PageID.1087); (ECF No. 1120-15, PageID.837) (photo of Bass's facial lacerations).

A prison officer investigated the incident by interviewing both parties and several inmates. Bass stated that the other inmate "sliced [him] up with a razor, [and he] just defended [him]self." (ECF No. 1129-4, PageID.1086). The officer concluded that the other inmate was trying to run the prison "like a pen" and was "viewed as a problem," while Bass preferred to "live peacefully," wanted to "prevent larger issues from happening," and "was forced to defend himself." (ECF No. 1129-4, PageID.1087). Upon his findings, the officer recommended that Bass "return to general population after disciplinary sanctions" and the other inmate "be transferred to another Medium Security Institution." (*Id.*).

It is clear to the Court from the prison's investigation, conclusions, and recommendations that although Bass was found guilty for fighting, the other

inmate was the violent instigator in both this incident and the prison at large — a lifestyle Bass wanted nothing to do with. This is further evidenced by fact that Bass has had no other disciplinary incidents, violent or otherwise, since the fight with this inmate over three years ago. In fact, Bass has had no other violent incidents in his twenty-two-year prison tenure. (ECF No. 1124-1, PageID.1063). Considering Bass's record, the 2017 fight appears to be random. However, Bass represents through counsel that the fight was not random at all, but the result of a targeted attack on Bass for attempting to help the Government identify and apprehend a murder suspect.

Since at least 2014, Bass has been providing information to Government agents regarding homicides in the Eastern District of Michigan. (ECF No. 1129, PageID.1073). On September 22, 2014, Bass was even transferred to Federal Detention Center (FDC) Milan from USP Terre Haute to help the U.S. Attorney's Office in person. (*Id.* at 1074). Although the investigation did not result in a prosecution, Bass states that rumors of his talks with the Government circulated in FDC Milan before he left. (*Id.* at 1074); (ECF No. 1130, PageID.1138); (ECF No. 1129-3, PageID.1082). Shortly after his return to Terre Haute, Bass discovered that the rumor, along with some of the inmates from Milan, had followed, and the target on his back grew larger — evidenced by an email that

his wife received from an inmate in Terre Haute who threatened to do bodily harm to Bass upon his return to the prison. (ECF No. 1129-3).

The BOP placed Bass in its Special Unit Housing pending an investigation into the threat. (*Id.*). Although the prison confirmed that Bass was providing information to the Government concerning homicides, they could not determine a "specific threat" to Bass's safety and returned him to general population. (*Id.*). Bass now argues that his fight in 2017 was an unprovoked attack motivated by his cooperation with the Government. The Government disputes this allegation and Bass's reliance on it as a basis for his compassionate release.

Specifically, the Government alleges Bass has not exhausted this claim for relief, because it was not raised in his initial request for compassionate release and Bass's safety in prison is not threatened by his cooperation with the Government. Both of the Government's arguments rely on the erroneous assumption that Bass proffers his cooperation agreement, and the Court interprets it, as a claim for compassionate release. The Court instead reads Bass's explanation of his cooperation as an attempt to contextualize Bass's 2017 fight, especially considering the non-violent nature of the rest of his prison term. Therefore, since it is not a claim for relief, it neither needs to fulfill the exhaustion requirement nor the "extraordinary and compelling" standard.

Bass's actions as a Government cooperator provide, first, context for the 2017 fight as a potentially targeted attack, and second, evidence of the extent of Bass's rehabilitation from and remorse over his past crimes. By placing himself in harms way to give information to the Government without personal gain, he has shown tremendous growth and dedication to helping to keep his community safe. Even assuming arguendo that the 2017 fight was in no way connected to his cooperation, the valiance and pure unselfish nature of these efforts cannot be overstated. Therefore, although it is not a basis for his release, Bass's cooperation activities shed a bright light on his character development.

What is most remarkable about Bass's rehabilitative efforts is that they are purely self-motivated. *See Gall v. United States*, 552 U.S. 38, 59, (2007) (citing 18 U.S.C. § 3553(a)(2)(B)-(C)) (finding that defendant's "self-motivated rehabilitation" supported the conclusion that incarceration was not necessary for deterrence and public protection purposes). Facing two life sentences with no possibility of parole, short of a presidential commutation, Bass had no hope for release or any external reason to tackle his drug addiction, mentor his peers, earn his GED, learn how his crimes impacted his victims, or attempt to help the Government solve a murder. Undeterred, he dedicated his incarceration to self-reflection, building a strong moral character, restoring family ties, and

developing skills that spur his peers onto realizing their best selves and full potential, rather than their worst vices.

Despite this, the Government argues that reducing Bass's sentence would be contrary to the jury's verdict of life in prison. This argument has two problems. First, by definition, a compassionate release request, when granted, reduces the sentence imposed either by a sentencing judge or a jury. This is permissible under the compassionate release statute, which states that "a sentence to imprisonment can subsequently be . . . modified pursuant to the provisions of subsection (c)." 18 U.S.C. § 3582(b). It also explicitly allows this Court to "modify a term of imprisonment once it has been imposed . . . *in any case*." 18 U.S.C. § 3582(c) (emphasis added). Barring sentence reduction because it contradicts the original sentence, would render the statute inoperative.

Second, the Government does not present, nor has the Court found, any case law that prohibits a life sentence reduction under the compassionate release statute. In fact, the case law from around the federal judiciary presents the opposite conclusion. For example, in *United States v. Lopez*, the court reduced a defendant's jury-imposed life sentence to time served after twenty-three years of rehabilitation in prison. 2020 U.S. Dist. LEXIS 200076, at *20. Likewise, in *United States v. Fisher*, the court granted compassionate release for a defendant who has served thirty-eight years of a life sentence after he showed that his age, health, and risk of

contracting COVID-19, in combination with his exceptional rehabilitation efforts, warranted release. 2020 U.S. Dist. LEXIS 188065, at *8 (S.D.N.Y. October 9, 2020); *see United States v. Hope*, 2020 U.S. Dist. LEXIS 86395, at *6 (S.D. Fla. April 10, 2020) (reducing a mandatory minimum life sentence due to sentence disparities, the defendant's rehabilitation, and his health risk due to COVID-19); *see also United States v. Millan*, 2020 U.S. Dist. LEXIS 59955, at *48 (S.D.N.Y. April 6, 2020) (granting compassionate release to defendant serving a life sentence upon evidence of his rehabilitation, remorse, and record as a "model prisoner.").

In deciding a sentence reduction, the § 3533(a) factors and notions of equal justice implore the Court to not only look to this defendant's prison term and conduct, but also to sentence disparities that may exist between this defendant and his co-defendants. Bass had twenty-one co-defendants. Each one was charged with a mix of drug conspiracy distribution, intentional killing, and felony murder for their efforts in furthering their joint criminal enterprise. But among the 11 charged with intentional killing and/or felony murder — Bas alone was sentenced to serve the rest of his life in prison. Including his time in pretrial detention, which began on October 30, 1998, Bass has spent just over twenty-two years in prison, while the murder charges of nine his co-defendants were dismissed altogether. (PSR ¶ 4); (ECF No. 372); (ECF No. 686); (ECF No. 696); (ECF No. 714); (ECF No. 724); (ECF No. 740); (ECF No. 741); (ECF No. 789);

(ECF No. 826); (ECF No. 851). Only one other co-defendant, Cornelius Webb, was convicted and sentenced for murder. After his federal charges were dropped, Webb was convicted of second-degree murder in Michigan state court and sentenced to 25-45 years in prison. (ECF No. 1129-5). On February 4, 2020, after serving over eighteen years, Webb was released parole. (*Id.*). Bass alone remains in prison. Other courts have found that sentencing disparity indicates that the defendant has served "an adequate punishment for his crimes." *United States v. Alexander*, No. 1:04 CR 529, 2020 U.S. Dist. LEXIS 198264, at *10 (N.D. Ohio Oct. 26, 2020); *see United States v. McClellan*, No. 1:92 CR 268, 2020 U.S. Dist. LEXIS 97136, at *8 (N.D. Ohio June 3, 2020). This Court decides the same.

The gravity of releasing a defendant serving a life sentence is not lost on this Court. Such a decision must be approached with extraordinary care and only be granted in cases of transformational redemption. This is such a case. Bass is, quite simply, a BOP success case. An exemplary inmate and man who has turned the pain and darkness of his former life on the streets into a light for those still lost in its grips. At the time of his sentencing, Bass was thirty-four years old, had an eighth-grade education, and six children he was leaving behind. Now, Bass is fifty-one years old, has a GED, is a certified life coach, and a true father and guide to his fellow prisoners and family alike. He has proven that he has more

than enough self-motivation to continue his rehabilitation journey outside of the confines of prison.

The Court has additionally reviewed and approved of Bass's re-entry plan. Upon release, Bass will reside with his wife in Eastpointe, MI. (ECF No. 1129-7, PageID.1100-01). A probation officer has spoken to his wife and verified the suitability of this placement. Bass hopes to help uplift his community by rehabilitating homes and starting a non-profit that mentors the youth. (*Id.* at 1098-99). Through sharing the perils of a life of crime, imploring them to learn from his mistakes, and encouraging them to dream bigger than their surroundings, Bass is eager for his life to be a cautionary tale. (*Id.*). Two business owners have also represented to the Court that they have a job waiting for Bass upon his return. (*Id.* at 1109-10). There is no doubt that Bass will be enveloped by a large and supportive community.

As the Court frequently remarks during hearings, it has no crystal ball. It can only base its decisions on the careful weighing of all the evidence from both parties and the applicable law. After this review, the Court determines that Mr. Bass is an appropriate candidate for compassionate release. Bass writes, "if given the chance, my future accomplishments will help me put my past behind me, or even prove that that chapter of my life does not define me." (ECF No. 1129-7, PageID.1099). Today, the Court gives Bass a well-earned, second chance.

CONCLUSION

**IT IS ORDERED** that Petitioner's Motion for Reduced Sentence is **GRANTED**.

**IT IS FURTHER ORDERED** that BOP officials at FCI McKean **IMMEDIATELY RELEASE** JOHN BASS (25435-039).

**IT IS FURTHER ORDERED** that upon his release, Bass will serve a three-year term of supervised release.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: January 22, 2021              Senior United States District Judge