# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 03, 2021

Mr. Andrew Goetz
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Ms. Stephanie Franxman Kessler
Pinales, Stachler, Young & Burrell
455 Delta Avenue, Suite 105
Cincinnati, OH 45226

Ms. Courtney Millian
Mr. Barry J. Pollack
Robbins, Russell, Englert, Orseck & Untereiner
2000 K Street, N.W., Fourth Floor
Washington, DC 20006

Mr. Douglas R. Mullkoff
402 W. Liberty
Ann Arbor, MI 48103

Re:  Case No. 21-1094, *USA v. John Bass*
Originating Case No. : 2:97-cr-80235-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

JOHN BASS,

*Defendant-Appellee.*

> No. 21-1094

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:97-cr-80235-1—Arthur J. Tarnow, District Judge.

Argued:  June 9, 2021

Decided and Filed:  November 3, 2021

Before:  ROGERS, WHITE, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant.  Douglas R. Mullkoff, Ann Arbor, Michigan, for Appellee.  **ON BRIEF:** Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant.  Douglas R. Mullkoff, Ann Arbor, Michigan, for Appellee.  Stephanie Franxman Kessler, PINALES STACHLER YOUNG & BURRELL CO., LPA, Cincinnati, Ohio, Barry J. Pollack, Courtney L. Millian, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Amicus Curiae.

ROGERS, J., delivered the opinion of the court in which MURPHY, J., joined.  WHITE, J. (pp. 16–19), delivered a separate dissenting opinion.

---------------------

## OPINION

---------------------

ROGERS, Circuit Judge.  In 2003, John Bass, a local drug kingpin in the state of Michigan, was convicted of murdering a hitman whom Bass had hired to kill Bass's half-brother. Though the Government sought the death penalty, Bass was ultimately sentenced to two concurrent terms of life imprisonment without the possibility of release.  In 2020, Bass moved for compassionate release due to COVID-19.  The district court granted Bass's request in January 2021 and ordered his immediate release.  In March, a divided panel of this court granted the Government's emergency motion to stay the release.  In this merits appeal, the Government argues that the district court abused its discretion when it granted Bass's request for immediate release.  Because the district court's decision rested upon legal errors, its decision to release Bass constituted an abuse of its discretion.  On remand, moreover, the district court must reevaluate the compassionate release request based on current facts and circumstances, which have materially changed.

## I.

From 1989 to 1997, Bass controlled a criminal organization known as the "Dog Pound," which was involved in the distribution of multi-kilogram quantities of cocaine base in Michigan and Ohio.  The organization routinely employed violence to further its goals.  As one example of the Dog Pound's ruthlessness, Joseph Chatman testified that Bass and other members of the organization thrashed and tortured Chatman after accusing him of stealing money.  According to Chatman, "Bass and others shot him in the chest, doused him with alcohol and set him ablaze," and "tortured Chatman with a hot iron before taking him to the hospital for treatment."  "During the torture Bass was heard saying 'Let's see what burning flesh smells like.'"  Bass and his half-brother, Patrick Webb, distributed crack cocaine as business partners before later creating their own separate organizations, but tensions between them grew over their respective drug businesses.  *United States v. Bass*, 460 F.3d 830, 832 (6th Cir. 2006).  In 1996, Bass hired Armenty Shelton to kill Webb so that Bass could capture his brother's portion of the drug business.  A few days after Webb's murder, Bass met with Shelton to make a drug deal.  *Id.*

While Shelton was examining the drugs, "Bass produced a handgun and proceeded to shoot Shelton," with the help of another half-brother, Cornelius Webb. The government later recovered the murder weapons during a search of Bass's residence and positively identified them as the weapons used in the murder of Shelton.

On August 11, 2003, a criminal jury convicted Bass of conspiracy to distribute five or more kilograms of cocaine and fifty or more grams of cocaine base in violation of 21 U.S.C. § 846, and firearms murder during or in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(j). The jury found Bass guilty of the murder of Shelton but acquitted him of Patrick Webb's murder. *Bass*, 460 F.3d at 834. As we observed in Bass's direct appeal, during the penalty phase of the trial, the defense represented to the jury that "there was no need to execute Bass because he would spend the rest of his life in prison if not given the death penalty." *Id.* His conviction on the murder offense meant he was punishable by death, life imprisonment, or imprisonment for a term of years, but for "strategic reasons" Bass's trial counsel "agreed to limit the jury's choice either to death or to life in prison." *Id.* at 839. We noted that:

> [d]efense counsel apparently did not want the jury to be given the option of imposing a term of years as it was inconsistent with her argument that there was no need to execute Bass because he would spend the rest of his life in prison if not given the death penalty. The jury declined to . . . impose the death penalty, opting instead to impose a life sentence.

*Id.* at 834. In March 2004, the district court sentenced Bass to life without the possibility of release on the drug trafficking charge, and life on the murder charge, with both set to run concurrently. We affirmed Bass's conviction and sentence on direct appeal. *Id.* at 832.

On June 28, 2020, Bass moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing the COVID-19 pandemic. Bass claimed that as a 51-year-old African American male suffering from morbid obesity, he faced a higher risk of severe illness from the virus while incarcerated. The Government opposed the motion but conceded that Bass's heightened risk from COVID-19 due to obesity meant that he had satisfied the first eligibility threshold for compassionate release under U.S.S.G. § 1B1.13(1)(A): that there were "extraordinary and compelling reasons" warranting his release. However, the Government argued that Bass was ineligible for compassionate release because he was still a danger to the

community under U.S.S.G. § 1B1.13(2), and because the 18 U.S.C. § 3553(a) sentencing factors strongly weighed against granting release.

While the motion was pending, one of Bass's surviving victims filed an anonymous statement with the court, writing that Bass "should not be released from jail" because he had "an evil mind to do what he did" and was "a threat to society."

Bass noted in supplemental briefing that as of December 9, 2020, FCI McKean (where he was imprisoned) had 167 active COVID-19 cases among the inmates housed there, which was approximately 20% of the inmate population. Bass also submitted the Bureau of Prisons' ("BOP") Male Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN") Risk Scoring Sheet, which allegedly shows that, based on an analysis of Bass's prison history and programming, he is a generally low-risk prisoner and less likely to reoffend.

On January 22, 2021, the district court granted Bass's motion for compassionate release. *United States v. Bass*, 514 F. Supp. 3d 977, 979 (E.D. Mich. 2021). Relying on CDC guidelines, the court found that Bass's obesity put him at an increased risk of severe illness from COVID-19. *Id.* at 982. Reviewing *sua sponte* the most recent BOP COVID-19 statistics available online, the court noted the prison's high infection rate, with 46% of inmates having been infected at one point and over one hundred active infections as of January 21. *Id.* The district court determined that Bass was at high risk of severe illness because of the high infection rate at FCI McKean and the risk that "not all prison populations are being prioritized for inoculation." *Id.*

Next, evaluating the sentencing factors articulated in 18 U.S.C. § 3553(a), the district court found that Bass's record of rehabilitation over twenty-two years of incarceration "significantly mitigate[d]" the Government's concern of Bass's danger to the community and risk of recidivism. *Bass*, 514 F. Supp. 3d at 983. Pointing to Bass's troubled upbringing, the court concluded that twenty-two years in prison was sufficient punishment for the crimes he had committed. *Id.* at 983-84. The district court emphasized Bass's life coaching activities and the testimony from family members demonstrating his personal growth, remorse, and commitment to his family. *Id.* at 984-86. The decision also rested on Bass's ostensibly low risk of recidivism as measured by the BOP's PATTERN score. *Id.* at 986. The court further stressed that the

reduction was appropriate to avoid a sentencing disparity between Bass and his twenty-one codefendants, including his half-brother Cornelius Webb, who was convicted of second-degree murder in state court and sentenced to 25-45 years in prison, but was released on parole after serving over eighteen years. *Id.* at 988-89. Consequently, the court ordered BOP officials to release Bass immediately, and that upon his release, Bass would serve a three-year term of supervised release, reduced from five years. *Id.* at 989.

On January 29, 2021, the Government appealed to this court and sought an emergency stay. On February 5, a motions panel of this court granted the stay in a 2–1 order. *United States v. Bass*, 843 F. App'x 733, 738 (6th Cir. Feb. 5, 2021) (order). The majority held that a stay was warranted because the Government was likely to succeed on the merits of its arguments that the district court's decision amounted to an abuse of discretion. *Id.* at 736. The majority reasoned that the district court had engaged in a substantively unreasonable balancing of the § 3553(a) factors by affording "too much weight to certain sentencing factors . . . and insufficient weight to others." *Id.* Dissenting from the stay order, Judge Stranch reasoned that the district court's order fell within the "expansive" discretion that district courts traditionally enjoy in deciding such motions. *Id.* at 738 (Stranch, J., dissenting).[1]

In this merits appeal, the Government contends that the mandatory nature of Bass's sentence to life "without the possibility of release" means that the district court's decision—even if permitted under the First Step Act's compassionate release provisions in 18 U.S.C. § 3582(c)(1)(A)—amounts to a "stunning" deviation from the jury's verdict. The Government also argues that the district court abused its discretion by improperly balancing the § 3553(a) factors, giving too much weight to some factors while giving too little weight to others.

---

[1]In response to the stay, on February 8, 2021, the district court entered a notice clarifying its compassionate release order. *Bass*, 514 F. Supp. 3d at 990-93. However, the district court lacked jurisdiction to file this opinion, *see United States v. Harvey*, 996 F.3d 310, 312 (6th Cir. 2021), so we do not consider it in our analysis here. "Typically, 'filing a notice of appeal with the district court divests the district court of jurisdiction to act in a case, except on remedial matters unrelated to the merits of the appeal.'" *Id.* (quoting *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 71 F.3d 1197, 1203 (6th Cir. 1995)). The exception to the rule, related to actions taken "in aid of the appeal," does not apply here. *Id.* at 313 (quoting *United States v. Sims*, 708 F.3d 832, 834 (6th Cir. 2013)). Thus, we do not consider the district court's clarification notice here.

On April 5, 2021, the Government submitted a letter noting that on April 2, 2021, Bass was offered the COVID-19 vaccine but refused it.

## II.

The district court abused its discretion by granting Bass's motion for compassionate release under § 3582(c)(1)(A). To qualify for compassionate release, a defendant must show that "extraordinary and compelling reasons warrant such a reduction," and the district court must consider the § 3553(a) sentencing factors to the extent they are applicable.[2] *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1004 (6th Cir. 2020). The district court's decision constituted an abuse of discretion because, at the very least, its analysis of the compassionate release factors rested upon two errors of law. On remand, moreover, the district court should take into account significant intervening changes in the degree of medical risk that Bass faces.

## A.

The district court's decision to grant Bass's compassionate-release motion constituted an abuse of discretion because its reasoning rested on errors of law. "An error of law is an abuse of discretion." *United States v. Lawrence*, 735 F.3d 385, 405 (6th Cir. 2013). Two legal errors are apparent in the district court's analysis, and "applying the wrong legal standard constitutes reversible error on abuse of discretion review." *E.g., Jackson v. City of Cleveland*, 925 F.3d 793, 813 (6th Cir. 2019).

First, the district court invoked the wrong legal standard in its evaluation of 18 U.S.C. § 3553(a)(6), the sentencing factor that concerns "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The district court noted that, of Bass's twenty-one codefendants, none was sentenced to life in prison like Bass, and the murder charges against nine of the codefendants were dismissed entirely. *Bass*, 514 F. Supp. 3d at 988. The court emphasized that only one

---

[2]Although there is a third requirement under the statute, providing that the court must find "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," we have held that this requirement does not apply where, as here, an inmate files the compassionate-release motion rather than the BOP. *United States v. Owens*, 996 F.3d 755, 759 & n.2 (6th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)).

codefendant, Cornelius Webb, was convicted of and sentenced for murder.  *Id.*  The federal charges against Webb were dropped, and he was convicted of second-degree murder in Michigan state court and sentenced to 25-45 years in prison, but was released on parole after serving eighteen years.  *Id.* at 988-89.  The district court reasoned therefore that this sentencing disparity between Bass and Webb indicated that Bass had "served 'an adequate punishment for his crimes.'"  *Id.* at 989 (quoting *United States v. Alexander*, No. 1:04 CR 529, 2020 WL 6268136, at *4 (N.D. Ohio Oct. 26, 2020)).

But the district court applied the wrong legal standard in its analysis of this sentencing factor.  "We have explained . . . that this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants."  *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (citing *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991)).  Although district courts may consider disparities among codefendants, the "only disparities relevant . . . are those among *federal defendants* on a national scale."  *United States v. Boucher*, 937 F.3d 702, 712 (6th Cir. 2019) (emphasis added).  This means that the district court improperly compared Bass's federal sentence to Webb's state court sentence.  Comparisons to state sentences "'enhance, rather than diminish, disparities' among similarly situated federal defendants" because "state courts may sentence defendants according to their own criteria without reference to the Guidelines."  *Boucher*, 937 F.3d at 712 (quoting *United States v. Malone*, 503 F.3d 481, 486 (6th Cir. 2007)).  "By considering state court sentences, a district court actually is re-injecting the locality disparity that the Sentencing Reform Act of 1984 ('SRA') was designed to guard against."  *Malone*, 503 F.3d at 486.  Making this federal/state comparison renders the resulting sentence unreasonable, and warrants vacatur of the sentence.  *Id.* at 485-86 (citing *United States v. Clark*, 434 F.3d 684, 686-87 (4th Cir. 2006)).  In taking this approach, we joined the vast majority of other circuits that have similarly held that federal sentences cannot be compared to state sentences when evaluating § 3553(a)(6), reasoning that otherwise all federal sentences would become dependent upon the law of the state within which the federal court sits.  *Id.* (collecting cases from other circuits).  Consequently, the district court abused its discretion by committing legal error when it compared Bass's federal sentence to Webb's state sentence.

Second, the district court applied the wrong legal framework to the compassionate release analysis by analogizing its role to that of a parole board. At the October 2020 hearing on Bass's motion, the district court stated that "for purposes of this hearing, this hearing is more like the trial Judge, that is me, sitting as a Parole Board." Adopting this "parole" view of the compassionate release statute infected the court's analysis with legal error. Although it recognized that there is no parole board in the federal system, the court approached this case with the view that, by passing the compassionate release statute, Congress had simply transferred the discretionary power to grant parole from the Parole Commission to district courts. That is incorrect.

The federal parole system was "based on concepts of the offender's possible, indeed probable, rehabilitation, a view that it was realistic to attempt to rehabilitate the inmate and thereby to minimize the risk that he would resume criminal activity upon his return to society." *Mistretta v. United States*, 488 U.S. 361, 363 (1989). In light of the resulting sentencing disparities across federal courts, this emphasis on rehabilitation was questioned and later discarded by Congress. *Id.* at 365-66. Instead, Congress "abolish[ed] the practice of parole" in 1984 in order "to make prison terms more determinate" and ensure that a defendant "must serve the great bulk of his assigned [prison] term." *United States v. Haymond*, 139 S. Ct. 2369, 2382 (2019). To replace parole, "Congress established the system of supervised release," which was introduced "only to encourage rehabilitation *after* the completion of [the defendant's] prison term." *Id.* (emphasis in original). This overhaul of the sentencing procedures marked a substantial shift away from the system of parole and emphasis on rehabilitation. That the new compassionate release procedure was developed after parole was abolished does not mean that Congress intended to reinstitute the system of parole when it modified the compassionate release statute in the First Step Act.

Furthermore, the Government correctly notes that analogizing the district court's role to that of a parole board ignores the key differences between parole and compassionate release. As stated above, the parole system was focused primarily on rehabilitation. *Mistretta*, 488 U.S. at 363. In contrast under the compassionate release statute, although the district court may consider a defendant's rehabilitation efforts, rehabilitation cannot alone qualify as an "extraordinary or

compelling" reason warranting release. *See Ruffin*, 978 F.3d at 1009; 28 U.S.C. § 994(t). Additionally, while parole was available for almost every defendant after serving one-third of his or her prison term, compassionate release is only available in "extraordinary" cases. *Compare* 18 U.S.C. § 4205(a) (repealed), *with* 18 U.S.C. § 3582(c)(1)(A). Moreover, if the defendant violated the terms of parole, he or she could be sent back to prison to serve the remaining prison term authorized for the original crime of conviction, while a grant of compassionate release cannot be reversed once made final. *Compare* 18 U.S.C. § 4214 (repealed) and *Haymond*, 139 S. Ct. at 2381-82, *with* 18 U.S.C. § 3582(c)(1)(A). Finally, parole was the province of the executive branch, which exercised nearly absolute discretion and was subject to political accountability, whereas compassionate release decisions are made by unelected district court judges. *Compare* 18 U.S.C. § 4214 (repealed) and *Clay v. Henderson*, 524 F.2d 921, 924 (5th Cir. 1975), *with* 18 U.S.C. § 3582(c)(1)(A).

As the Government points out, this is an especially odd case to adopt this "parole" approach to compassionate release, because Bass was sentenced to life imprisonment without the possibility of release. The district court was statutorily required to impose that sentence once it was recommended by the jury. 18 U.S.C. § 3594. Were the parole system still in existence today, Bass would not be eligible for parole, because his sentence contemplates that there is no possibility by which he may be released. It is incoherent then for the district court to invoke the parole system as a guidepost for its decision to grant compassionate release.

By analogizing its role to that of a parole board, the district court framed the legal question in a manner that Congress had expressly condemned when it shifted away from the rehabilitation focus of criminal sentencing. The court erred by conflating the old parole system with the new compassionate release framework established under the First Step Act. A district court "abuse[s] its discretion by incorrectly framing the legal standard." *United States v. Gissantaner*, 990 F.3d 457, 468 (6th Cir. 2021). Thus, the district court's "parole" approach in this case was an incorrect framing of the legal standard for the compassionate release determination and constituted an abuse of its discretion.

Bass presents no argument contesting either error of law discussed above.  Consequently, the district court's reasoning was infected with legal error, and the court abused its discretion by granting Bass's motion for compassionate release.

### B.

The district court may also abuse its discretion by "engag[ing] in a substantively unreasonable balancing of the § 3553(a) factors." *Ruffin*, 978 F.3d at 1005.  While the district court has great discretion, we may nonetheless find an abuse of that discretion if the court has given too little weight to a compelling factor in the presence of much lighter countervailing factors.  A "sentence is substantively unreasonable when it is not 'proportionate to the seriousness of the circumstances of the offense and offender.'" *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020) (quoting *Robinson*, 778 F.3d at 519).  Given Bass's terrible crimes, spanning nearly a decade in length, a prison term of twenty-two years does not on its face appear proportionate to the seriousness of Bass's offenses, especially in light of the fact that his crimes rendered him eligible for the death penalty.

While we do not rely solely on such a reweighing on this appeal, the legal errors named above being by themselves sufficient for a remand, we are concerned that the heinous nature of the crimes committed by Bass—so heinous that prison without the possibility of release was imposed as an alternative to capital punishment—may not be substantively outweighed by Bass's rehabilitation and other mitigating factors.

This is not a procedural concern in this case.  As the dissenting judge on the motions panel explained, in compassionate release cases we have been loath to impose elaborate requirements that district judges make factual findings or explanations.  *Bass*, 843 F. App'x at 739 (order) (Stranch, J., dissenting) (citing *United States v. Quintanilla-Navarro*, 986 F.3d 668 (6th Cir. 2021)).  Appellate courts can generally ascertain from the record what the district court took into account, or could have taken into account, in making its discretionary decision whether to grant or deny compassionate release.  Thus we do not fault the district court in this case, for instance, for not setting forth the nature and circumstances of Bass's criminal offenses in detail.  We are confident that the district court is well aware of Bass's terrible crimes.  What is troubling

is the limited weight that such crimes are inherently given when they are outweighed by the rehabilitation and other mitigating factors that the district court did rely upon.[3]

Bass operated an interstate drug conspiracy that routinely used violence to effectuate its goals, often coercing and even torturing its members to ensure that they acted violently and broke the law while performing their organizational duties. Bass personally carried out the violence and torture, in one instance shooting a subordinate, dousing him in alcohol, setting him on fire, and then torturing him with a hot iron, all the while saying "[l]et's see what burning flesh smells like." While Bass was building and operating his interstate crime organization, he was also feuding with his own brother, whom he ultimately had murdered.

The district court discounted Bass's culpability for his actions, finding them "sadly unsurprising" in light of his "abject poverty" and the "household trauma" he suffered while growing up. *Bass*, 514 F. Supp. 3d at 983. Though the district court acted within its discretion

---

[3]The sentencing factors set forth in § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .

        i)  [United States Sentencing Guidelines, ("U.S.S.G.")]—

        ii) [in effect at the time of sentencing; . . . ]

(5) any pertinent policy statement—

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code . . . ; and

    (B) [in effect at the time of sentencing;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

to consider Bass's childhood trauma, these same facts were known at the time of Bass's original sentencing, but did not prevent the jury and district court from concluding then that life imprisonment without the possibility of release was the appropriate punishment for Bass's crimes.

Moreover, the district court's focus on Bass's familial relationships disregarded historical context in the record. The district court emphasized that despite Bass's poverty and lack of parental guidance, "[h]is age and natural leadership ability led him to raise both himself and his siblings through childhood," and he was "[p]reoccupied with his role in the family." *Bass*, 514 F. Supp. 3d at 983-84. This does not take into account that it was Bass himself who enlisted five of his siblings to assist him in his criminal enterprise. On top of that, Bass had one brother murdered and enlisted the help of another brother in a plot to commit murder, causing both of them to go to prison.

The district court also reasoned that, balancing Bass's crimes "with the circumstances under which they were committed," his twenty-two-year incarceration was "'sufficient, but not greater than necessary,' to fulfill the purposes of his punishment." *Bass*, 514 F. Supp. 3d at 984 (quoting 18 U.S.C. § 3553(a)). This conclusion does not fit the facts of Bass's case. Bass's crimes were so severe that the Government sought the death penalty, and Bass's own defense counsel assured the jury that Bass would never leave prison in an effort to avoid imposition of the death penalty. *Bass*, 460 F.3d at 834. The district court justified Bass's release by repeatedly emphasizing Bass's commitment to rehabilitation and education. *Bass*, 514 F. Supp. 3d at 984-88. But the district court failed to square this lengthy rehabilitation analysis with the fact that Bass's original sentence was life imprisonment without the possibility of release. This sentence would have ensured that the fifty-two-year-old Bass would remain in prison for the rest of his life, which could conceivably extend for several decades. In deciding Bass's original sentence, the jury and the district court had already considered and rejected the possibility that Bass could be rehabilitated, or that his capacity for rehabilitation warranted the potential for an early release. This is not to say that compassionate release is never available for a defendant sentenced to life imprisonment without the possibility of release. We assume that there are circumstances that would warrant compassionate release for a defendant so sentenced. But the

nature of Bass's life sentence calls into question the district court's decision to afford substantial weight to Bass's efforts at rehabilitation after only twenty-two years in prison.

The district court relied on Bass's reportedly "low" PATTERN score as proof that Bass was at low risk of reoffending upon release. But as the Government argued, the PATTERN score can be a flawed method of measuring recidivism risk. The Government observed that a score of "low" still equates to a 24% chance of reoffending within three years, which is a substantial risk given the severity of Bass's crimes. Moreover, the BOP calculates the PATTERN score based on "yes" or "no" answers as to whether a defendant committed a violent offense but does not distinguish between different types of violent offenses. Taken together, this means that Bass's score for nearly a decade of violent criminal activity could be the exact same as if he had committed a single robbery on one occasion. The district court's analysis does not account for these limitations and simply restated that Bass's score was "low." *Bass*, 514 F. Supp. 3d at 986. The PATTERN score limitations identified by the Government are never addressed by the district court and remain uncontested by Bass on appeal, casting serious doubt upon the district court's deterrence analysis.

The district court also gave little weight to the concern that Bass's release might endanger the public. 18 U.S.C. § 3553(a)(2)(C). The court dismissed this concern in the same manner in which it dismissed the deterrence factor, relying on Bass's apparently self-motivated rehabilitation efforts. *Bass*, 514 F. Supp. 3d at 987-88. However, the district court disregarded the anonymous victim's statement showing that there are still members of the community who believe that Bass is dangerous and "a threat to society." The district court found that Bass was at low risk of causing harm to the public, yet its analysis lacked consideration of the long duration of Bass's criminal activity, the fact that he approached his violent crime in a cruel and calculated manner without remorse, the fact that Bass was not especially young when he committed the offenses, or the fact that his violent acts were not isolated incidents or temporary lapses in judgment. As the Government notes, Bass's educational and mentoring endeavors while incarcerated do not prove that his potential for violence has necessarily diminished.

Thus, these concerns show that the district court's balancing of the § 3553(a) was, at least in part, substantively unreasonable. This is not to say that the district court's ultimate conclusion

was an abuse of discretion.  Rather, the deficiencies identified above indicate that certain portions of the district court's reasoning, particularly those with respect to Bass's rehabilitation, amounted to an abuse of the district court's discretion.  Consequently, the district court should consider the § 3553(a) factors anew on remand.

In sum, an application of the § 3553(a) factors on remand free of the legal errors identified in part II.A should also take into account the concerns in this part II.B.

## III.

However, due to the rapidly evolving conditions of the COVID-19 pandemic while this case was stayed, the underlying facts have substantially and materially changed.  Accordingly, on remand, the district court should as an initial matter revisit the initial determination that "extraordinary and compelling reasons" exist, based on reconsideration of two core findings: the high rate of COVID-19 infections at FCI McKean and the risk that "not all prison populations are being prioritized for inoculation."  *Bass*, 514 F. Supp. 3d at 982.  Together, the district court took these findings to mean that Bass faced a substantial medical risk of severe illness due to spread of COVID-19 in his prison.  *Id.*  At the time the district court issued its decision, 383 inmates had either tested positive for the virus or had recovered, amounting to 46% of the prison population.  *Id.* (citing *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited January 21, 2021)).  However, there are now just eight active cases at the facility, which are all members of the prison staff.  *COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited November 1, 2021).  All others infected with the virus have recovered, and there have been no deaths due to COVID-19 at FCI McKean.  *Id.*  Moreover, 851 inmates and 33 staff members have been fully inoculated against the virus, meaning over 83% of the inmate population has been fully inoculated.  *Id.*; *see also FCI McKean*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/mck/ (last visited November 1, 2021).  Indeed, the Government notified this court that on April 2, 2021, Bass was offered the COVID-19 vaccine, but he refused it.

In light of the district court's original concerns that Bass would not be prioritized for inoculation, and the risk that he faced due to the facility's high infection rate, these new

developments demonstrate that the material facts the district court relied upon are no longer the case.  Consequently, on remand the district court should apply the relevant risk analysis based on current information.  When "material facts underlying the district court's judgment have changed during the appeal, appellate courts have remanded the case to the district court for further proceedings."  *Neumann v. Neumann*, 684 F. App'x 471, 483 (6th Cir. 2017).  This is consistent with the approach taken by our sister circuits.  *See United States v. Brown*, 820 F. App'x 214, 219 (4th Cir. 2020); *Nat'l R.R. Passenger Corp. v. State of Fla.*, 929 F.2d 1532, 1538 (11th Cir. 1991); *New England Merchants Nat. Bank v. Iran Power Generation & Transmission Co.*, 646 F.2d 779, 783-84 (2d Cir. 1981); *Concerned Citizens v. Sills*, 567 F.2d 646, 649-50 (5th Cir. 1978).  Consideration of these new factual developments would be consistent with the district court's own approach in this case, as it already relied upon the most up-to-date facts available following Bass's petition.  *Bass*, 514 F. Supp. 3d at 982.  The court, of its own accord, relied on BOP statistics from January 21, 2021, before issuing its decision the following day.  *Id.*  On remand, the district court should similarly consider the most current circumstances in determining whether extraordinary and compelling reasons for granting Bass's compassionate release motion still exist.  It should also consider our recent caselaw on this subject.  *See United States v. Hunter*, 12 F. 4th 555, 561-72 (6th Cir. 2021).  We leave it to the district court to decide in the first instance whether, based on these new facts, Bass is entitled to compassionate release.

Accordingly, we remand for the district court to reexamine first whether there are currently "extraordinary and compelling reasons" warranting his release.  If so, the court should proceed to determine whether compassionate release is still warranted under the First Step Act in light of the law set out in this opinion.

## IV.

The judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.

---------------

## DISSENT

---------------

WHITE, Circuit Judge, dissenting. I would not have granted Bass's motion for compassionate release, but under the compassionate-release jurisprudence this court has developed over the past year and a half or so, our disagreement with a district court's exercise of its discretion is expressly excluded as a ground for reversal.  We require district courts to provide only the most minimal explanation, *see, e.g.*, *United States v. Quintanilla Navarro*, 986 F.3d 668, 673 (6th Cir. 2021) (affirming a district court's single-sentence order), and we must defer to their judgment in weighing the § 3553(a) factors and not substitute our own, *see United States v. Ruffin*, 978 F.3d 1000, 1005 (6th Cir. 2020); *United States v. Hogg*, 858 F. App'x 816, 818 (6th Cir. 2021); *United States v. Keefer*, 832 F. App'x 359, 362–65 (6th Cir. 2020).

I agree that the district court erred in stating that "the section 3553(a) factors and notions of equal justice implore the [c]ourt to not only look to this defendant's prison term and conduct, but also to sentence disparities that may exist between this defendant and his co-defendants," and in comparing Bass's time served with that of his co-defendant cousin, Cornelius Webb, who had recently been granted parole after serving eighteen years of his twenty-five-to-forty-five-year state-court sentence.  *United States v. Bass*, 514 F. Supp. 3d 977, 988–89 (E.D. Mich. 2021).  Subsection 3553(a)(6) refers to national disparities.  *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007).  And, although district courts are permitted, but not required, to look at disparities between federal co-defendants, they may not consider a co-offender's state sentence because doing so may enhance federal disparities.  *Id.* at 624; *United States v. Malone*, 503 F.3d 481, 485–86 (6th Cir. 2007).

But it is clear that even without this error, the district court would have granted Bass's motion for compassionate release.  First, in discussing the § 3553(a) factors in response to Bass's motion, the Government addressed several enumerated factors but did not argue the need to

avoid unwarranted disparities as a ground for denying the motion.[1]  Thus, the court's error did not involve a factor that was argued to weigh against release.  Second, in its opinion and order granting relief, the district court did not address the cited disparity until pages twenty-three and twenty-four of its twenty-six-page opinion, after it had addressed the seriousness of Bass's offenses, whether he continues to be dangerous, his conduct in prison, his rehabilitation, and his cooperation in providing information to the authorities at personal risk of retaliation by other inmates, leaving to be discussed only the adequacy of his punishment to date and his reentry plan.  *Bass*, 514 F. Supp. 3d at 982–89.  At that point, the court turned to consideration of Bass's co-offenders for guidance on whether Bass's twenty-two years in prison was "an adequate punishment for his crimes," not whether Bass's sentence should be lowered to avoid unwarranted disparities.  *Id.* at 989.  Indeed, the district court reaffirmed that life imprisonment was an appropriate sentence at the time Bass was sentenced.  *Id.*  Fairly read, the district court viewed the experiences of Bass's co-offenders not so much as an affirmative reason to grant relief as not presenting a reason to withhold relief on the basis that Bass had not been adequately punished. And given the discussion that preceded and followed the discussion of Bass's co-offenders, it is clear that the court would have granted relief even without considering the identified disparities.

The majority additionally concludes that the district court "applied the wrong legal framework to the compassionate release analysis by analogizing its role to that of a parole board."  Majority Op. at 8.  I agree that the analogy is inapt, but the district court did not adopt that analogy as its governing standard.  The parole-board reference was an isolated comment made at the hearing on Bass's motion.  There was no such statement in the district court's twenty-six-page order granting relief.  Further, as the majority acknowledges, immediately after the comment, the district court observed that there is no parole board in the federal system and recognized that its task (after addressing whether there were extraordinary and compelling reasons supporting compassionate release) was to focus on the § 3553(a) factors.  *See United States v. Jones*, 980 F.3d 1098, 1106–11 (6th Cir. 2020) (discussing the requirements under

---

[1] In its supplemental brief, the Government argued that Bass's continued incarceration would not create a sentencing disparity with Webb because Webb was convicted of second-degree murder, not first, and Webb was not equally culpable, as he only assumed control of the organization after Bass was imprisoned.  It did not, however, argue that compassionate release would create an unwarranted disparity.  The Government's central argument, in both its briefs and at the hearing, was that Bass poses a risk to the community.

18 U.S.C. § 3582(c)(1)(A) when a prisoner files a motion for compassionate release). The district court followed the established legal framework in its written opinion and order granting relief as well. *Bass*, 514 F. Supp. 3d at 981–83. Accordingly, the district court did not apply the wrong legal framework; it simply made an inapt analogy in passing before proceeding to apply the correct legal framework.

Lastly, while being careful not to reverse on this basis and to recognize the deference we usually accord to district courts in deciding compassionate-release motions, the majority engages in an extensive discussion of its disagreement with the weight the district court placed on various § 3553(a) factors. Not only is this discussion contrary to our established framework for reviewing compassion-release rulings, *cf. Jones*, 980 F.3d at 1112–14, it also "infringes on the discretion our recent cases give to district courts . . . [and] risks enshrining a double standard unduly favoring the Government's opposition to compassionate release." *United States v. Bass*, 843 F. App'x 733, 740 (6th Cir. 2021) (Stranch, J., dissenting).

Its reasoning is faulty too. Although the majority does not question that prisoners subject to life sentences for murder are eligible for relief under 18 U.S.C. § 3582(c)(1)(A), it repeatedly expresses its discomfort with the district court's conclusion that the heinous nature of Bass's crimes could be outweighed by his rehabilitation and other mitigating factors. The majority asserts that the district court discounted Bass's culpability for his actions by characterizing Bass's criminal activity as "sadly unsurprising" in light of his "abject poverty" and "household trauma" while growing up, all factors present at the original sentencing. Majority Op. at 11 (quoting *Bass,* 514 F. Supp. 3d at 983). But the district court repeatedly recognized the "very, very serious and dangerous" nature of Bass's crimes, that he did "awful" things, that his behavior was "horrendous," and that when sentenced, his record supported the life sentence. R. 1134 PID 1301, 1306, 1327; *see also Bass*, 514 F. Supp. 3d 983 ("There is no question that Bass's offenses were horrific."). It also expressly observed that the trauma Bass experienced as a child humanized him but did not "mitigate against the fact that he was convicted of first-degree murder under state law definitions." R. 1134 PID 1309; *see also Bass*, F. Supp. 3d at 984 ("[His] history does not excuse his crimes."). Further, the district court expressly acknowledged the unusual nature of the motion: "The gravity of releasing a defendant serving a life sentence is not

No. 21-1094                          *United States v. Bass*                          Page 19

lost on this [c]ourt.  Such a decision must be approached with extraordinary care and only be granted in cases of transformation redemption." *Bass*, F. Supp. 3d at 989.  Thus, I do not agree that the district court discounted Bass's criminal responsibility.

        As I said at the outset, I would not have granted this motion.  However, the district court adequately explained its decision and did not abuse its discretion in concluding otherwise.  We must apply the same rules on review without regard to whether the government or the inmate is aggrieved by the district court's decision.  "Our trust in the discretion of the district court must be consistent regardless of whether the district court grants or denies a [compassionate-release motion]." *Bass,* 843 Fed. App'x at 740.

        For the foregoing reasons, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1094

UNITED STATES OF AMERICA,

     Plaintiff - Appellant,

     v.

JOHN BASS,

     Defendant - Appellee.

**FILED**
Nov 03, 2021
DEBORAH S. HUNT, Clerk

Before:  ROGERS, WHITE, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk